E-FILED
Tuesday, 27 March, 2018  11:11:24 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| JOHN DOE | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | |
| ILLINOIS STATE UNIVERSITY, JOHN M. | ) | |
| DAVENPORT, as an agent for Illinois State | ) | |
| University, LEVESTER JOHNSON, as an | ) | COMPLAINT |
| Agent for Illinois State University, ASHLEY | ) | AND |
| FRITZ, as an agent for Illinois State University, | ) | JURY TRIAL DEMAND |
| JANICE BLAIR, as an agent for Illinois State | ) | |
| University. | ) | |
| | ) | |
| Defendants | ) | |

## **COMPLAINT**

Plaintiff, John Doe,[1] by his attorneys with Johnson Law Group, LLC and for his

Complaint against Defendants Illinois State University, John M. Davenport, Levester Johnson,

Ashley Fritz, Janice Blair (collectively, "Defendants"), alleges as follows:

## **THE NATURE OF THIS ACTION**

1.      This action based on constitutional due process, Title IX reverse discrimination

and related state law, is brought on behalf of Plaintiff, John Doe, ("Plaintiff" or "John Doe"), a

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed Under Pseudonym. As set forth in the Motion, Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis for his Complaint, and the fact that Illinois State University is fully aware of his identity and will not be prejudiced in any way. Plaintiff also seeks to maintain the privacy rights of his accusers by requesting permission to identify them anonymously as "Jane Doe" and "Jane Roe".

former suspended student at Defendant Illinois State University ("ISU" or the "University") and seeks damages and injunctive relief.

2.      ISU has denied male students their rights to fair and due process in the investigation and adjudication of sexual misconduct complaints. ISU denied John Doe such rights in the University's handling of two Title IX cases. The University's grievous mishandling of accusations against John Doe and its deeply flawed and biased disciplinary process resulted in John Doe being suspended from the University. The University's mishandling caused John Doe to fail his courses during the Fall of 2016 semester. The University's mishandling and the suspension imposed required John Doe to withdraw from the University for the then upcoming Spring semester of 2017. This was all despite John Doe being vindicated at two subsequent Title IX hearings.

3.      After receiving a report from a female student, Jane Doe, accusing John Doe of nonconsensual sexual contact approximately two weeks earlier, ISU failed to conduct an adequate, reliable, and impartial investigation and Title IX hearing. ISU treated John Doe in a manner inconsistent with ISU's policies and procedures, stripping him of his rights to a fair and just investigation and adjudication process.

4.      During ISU's investigation of Jane Doe's report, ISU received a second report from a second female student, Jane Roe, who was a friend of the first accuser, Jane Doe, concerning sexual contact she had with John Doe approximately one year earlier. ISU again treated John Doe in a manner inconsistent with ISU's policies and procedures and stripped him of his rights to a fair and just investigation and adjudication process during the University's handling of a second Title IX case.

5.      Despite conflicting evidence being provided by Jane Doe, a lack of evidence and a failure to appear by Jane Roe, and ISU's knowledge that the McLean County State's Attorney's Office had declined to file charges against John Doe, ISU moved forward with two Title IX cases and imposed severe pre-hearing sanctions upon John Doe.

6.      Although ISU subsequently reached the correct conclusions that John Doe had not engaged in misconduct, ISU should not have imposed severe pre-hearing penalties upon John Doe; ISU should not have moved forward with the unfair hearings due to the lack of evidence and witness testimony to support either Jane Doe or Jane Roe's claims; and ISU should not have allowed John Doe's suspension to linger after John Doe had been vindicated at the two adjudicatory hearings.

7.      ISU indicated a bias towards male students when it investigated and adjudicated allegations against John Doe, when ISU initially barred John Doe from portions of the ISU campus prior to being provided with the opportunity to be heard, and when ISU suspended John Doe from the entire campus, during a portion of his 4th year at ISU, during the course of the disciplinary process, and prior to any evidentiary hearings or the presentation of any evidence to substantiate the severe pre and post hearing penalties imposed upon John Doe.

8.      ISU relied on prejudicial assumptions and at all times John Doe was deemed guilty. Consequently, John Doe was initially barred from portions of campus for a seven month period and subsequently suspended from the entire campus for approximately two months. This resulted in John Doe failing his Fall of 2016 classes, being harassed and treated negatively by fellow students and colleagues due to being labeled as a sex offender. This resulted in John Doe suffering from humiliation and depression and resulted in his ultimate withdrawal from the

3

University. These extreme and severe sanctions were not warranted in light of the lack of evidence.

9.      Defendant ISU conducted procedurally flawed investigations and adjudication process' that lacked due process, engaged in anti-male discriminatory bias in violation of Title IX, and failed to abide by ISU's contractual obligations to John Doe, which resulted in unduly severe, disproportionate sanctions being imposed against John Doe.

## THE PARTIES

10.      John Doe is a natural person residing in the State of Illinois. During the events described herein, John Doe was a student at ISU. John Doe has resided in the State of Illinois for 23 years. John Doe's parents also reside in the State of Illinois.

11.      Defendant Illinois State University ("ISU" or the "University") is a public university located in Normal, Illinois.  ISU is a recipient of state and federal grants, funding and contracts.

12.      At all times material hereto, ISU acted by and through its agents, servants, employees and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of ISU's business, mission or affairs.

13.      Upon information and belief, Defendant John M. Davenport is a resident of the State of Illinois and was the Dean of Students at ISU at all relevant times herein.

14.      Upon information and belief, Defendant Levester Johnson is a resident of the State of Illinois and was the Vice President for Student Affairs at ISU at all relevant times herein.

15.      Upon information and belief, Defendant Ashley Fritz is a resident of the State of Illinois and was the Deputy Title IX Coordinator at ISU at all relevant times herein.

16.    Upon information and belief, Defendant Janice Blair is a resident of the State of Illinois and was a Senior Specialist, Student Conduct and Conflict Resolution, Dean of Students Office at ISU at all relevant times herein.

## JURISDICTION AND VENUE

17.    This Court has original federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims are brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

18.    This Court has personal jurisdiction over Defendants on the basis that Defendants are conducting business at ISU and within the State of Illinois.

19.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.    Background under the Obama Administration: The "April 2011 Dear Colleague Letter" of the Department of Education (DOE) Office for Civil Rights OCR**

20.    On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter" attached hereto as Exhibit A). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

21.    The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve

complaints of sexual misconduct. Most notably, the "April 2011 Dear Colleague Letter" required schools to adopt a relatively low burden of proof - "more likely than not" - in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing" standard of proof, and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

22.     The "April 2011 Dear Colleague Letter" states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The "April 2011 Dear Colleague Letter," while not completely ignoring due process concerns, suggested that schools focus more on victim advocacy. The "April 2011 Dear Colleague Letter" states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the "April 2011 Dear Colleague Letter" was published, many schools changed their sexual assault and sexual harassment policies and procedures.

23.     The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education ("DOE") in charge of its Office for Civil Rights ("OCR"), delivered the following marching orders to colleges and universities:

>        (A)     In February 2014, Lhamon told college officials attending a conference at
>        the University of Virginia that schools needed to make "radical" changes.
>        According to the Chronicle of Higher Education, college presidents said afterward
>        that there were "crisp marching orders from Washington." "Colleges Are

6

Reminded of Federal Eye on Handling of Sexual-Assault Cases,"(See Chronicle of Higher Education, February 11, 2014).

(B)     In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX..." She also told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

(C)     In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding, "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . .  It means that so far the process has been working."(Meredith

Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014.

(available at:http://www.msnbc.com/msnbc/campus-sexual-assaultconference-

dartmouthcollege#51832)

(D)    Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and

sexual assault as seriously as we should, . . . [There is] a need to push the country

forward."(Savage and Timothy M. Phelps, "How a little-known education office

has forced far-reaching changes to campus sex assault investigations," Los

Angeles Times, August 17, 2015).

24.    To support making the "April 2011 Dear Colleague Letter" binding, the OCR

hired hundreds of more investigators for Title IX enforcement. As of January 3, 2017, the

Federal Government has 423 open investigations at institutions of higher education. The

Department of Education has negotiated settlements with many schools, including Ohio State

University.

25.    The colleges and universities under OCR investigation are fearful of being

sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice

("DOJ"). In April 2014, the White House issued a report entitled "Not Alone," which included a

warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing

federal funds" and that the DOJ shares authority with OCR for enforcing Title IX and may

initiate an investigation or compliance review of schools. The Report further warns that if a

voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, former

Vice President Joe Biden suggested that schools that do not comply with administration

guidelines could be stripped of federal funding. The vice president said "he'd like to take away

8

federal funding from those universities." "Obama, Biden Won't Visit Universities That Fall

Short In Addressing Sexual Assault," (Huffington Post, July 4, 2016)

26.     To revoke federal funds—the ultimate penalty—is a powerful tool because

institutions receive billions of dollars a year from the federal government. Anne Neal of the

American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in

the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are

running so scared of violating the civil rights of alleged victims that they end up violating the

due process rights of defendants instead." (How Campus Sexual Assaults Came To Command

New Attention, NPR, August 12, 2014).

27.     The DOE and OCR have created a significant amount of pressure on colleges and

universities to treat all those accused of sexual misconduct with a presumption of guilt. The

Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and

the federal government to improve the campus climate." "Presumed Guilty: College men

accused of rape say the scales are tipped against them," (Chronicle of Higher Education,

September 1, 2014). In the same article, the Chronicle noted that different standards were applied

to men and women: "Under current interpretations of colleges' legal responsibilities, if a female

student alleges sexual assault by a male student after heavy drinking, he may be suspended or

expelled, even if she appeared to be a willing participant and never said no. That is because in

heterosexual cases, colleges typically see the male student as the one physically able to initiate

sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College

men accused of rape say the scales are tipped against them," (Chronicle of Higher Education,

September 1, 2014). Robert Dana, Dean of Students at the University of Maine, told NPR that

some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges

and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus

Say System Works Against Them," (NPR, September 3, 2014).

28.     In May 2016, the National Association of College and University Attorneys

published a research note urging colleges and universities to "promptly destroy" documents such

as "emails … staff notes … notes of hearing participants during a disciplinary hearing, drafts of

hearing outcome reports, and other such working papers," all of which "might actually prove

very useful to a plaintiff's lawyer" in a subsequent lawsuit and could contradict or undermine the

single record the institution retains. (Seehttp://counsel.cua.edu/res/docs/titleixlitigation.pdf)

29.     On October 19, 2016, the OCR announced it had opened an investigation into

Texas educational institution Baylor University's handling of Title IX cases. The investigation

had been reported to be prompted by a complaint filed on September 26, 2016 by Baylor's

former Title IX coordinator, who resigned a week later amid allegations she had made that senior

leaders at Baylor prevented her from properly investigating Title IX cases. The OCR

investigation and resignation of Baylor's Title IX coordinator came over a year after students

began accusing Baylor of mishandling cases of alleged sexual assault.

(Seehttps://www.nytimes.com/2016/10/20/sports/ncaafootball/baylor-federal-investigation-title-

ix-violations.html)

30.     When the Baylor University scandal broke, media outlets pointed to the fact that

the U.S. Department of Education ("DOE") has the ability to terminate federal funds, and that

although Baylor is private school, it receives federal funding via student federal financial aid for

tuition. (See http://www.espn.com/college-football/story/_/id/17836024/us-departmenteducation-

launch-baylor-probe-title-ix-complaint)

31.     Upon information and belief, the Baylor University scandal created a chilling effect among other universities throughout the nation, including schools like ISU. ISU, therefore, was reasonably aware that the situation at Baylor had shined a light on other schools for their handling of sexual assault cases and had the potential to produce negative publicity for ISU.

32.     In response to pressure from OCR, DOJ, and the Obama Administration, educational institutions, like Defendant ISU —which also face negative publicity in the wake of the Baylor investigation—have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

**B.      ISU made policy changes to how the University handles sexual misconduct cases**

33.     In years subsequent to 2011, the University revamped its policy and procedures regarding how ISU would handle sexual misconduct cases. The revamped sexual misconduct policy replaced the University's long-standing hearing process with a single investigator process in sexual misconduct cases.

34.     ISU's revamped sexual misconduct policy as conceived and implemented by the University was deliberately designed to favor the female accuser and disadvantage the accused male by, amongst other things, eliminating from the process fundamental procedural safeguards for the accused.

35.     ISU's revamped sexual misconduct policy's procedurally deficient process was intended to subject male students to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always male, and the Policy on its face and as implemented in John Doe's case deliberately accorded unequal treatment to John Doe and other accused male students.

11

36.     The revamped sexual misconduct policy was systemically inequitable toward accused students who are overwhelming male. Among the many procedures that unfairly disadvantaged accused male students, the sexual misconduct policy eliminated a full hearing process, in which both parties had an equal opportunity to question and confront each other and witnesses and to present evidence in front of an impartial and independent Hearing Officer.

37.     The single investigator process eliminated any semblance of fairness toward students accused of sexual misconduct (who are overwhelmingly male), and reflected the University's intentional, institutionalized gender bias, in which female complainants are presumed to be "survivors" and "victims" of sexual assault and accused males are presumed to be "perpetrators" merely on the basis of the accusation.

38.     The contrast between the prior hearing process and the single investigator process is stark.  The single investigator process allowed ISU's Title IX Coordinator/Investigator to interview the complainant(s) and third party witnesses and then submit written reports regarding such to the Administrative Hearing Officer to be considered as evidence. This disallowed John Doe the opportunity to confront and question each of the witnesses included in the Title IX Investigator's report. The Hearing Officer was given "sole discretion" to "weigh and consider" the reports as evidence in making its decision. The accused was entitled to see the witness statements in the Title IX Investigators report but was not allowed to cross examine the witnesses contained in the reports.

39.     In the single investigator process, an investigator employed by the University interviewed the parties and witnesses separately behind closed doors, collected and weighed the evidence, and made narrative findings of fact and credibility assessments in a Report for the

Hearing Officer. The accused never heard what the complainant or any witnesses were asked in the investigation, and only knew what they said as filtered by the investigator in the Report.

40.     The accused was only entitled to "notice of the allegations" at some unspecified time "before the hearing." In practice, the University withheld that information until the accused received the investigator's report after the investigation had ended, even though of course the complainant was fully aware of her allegations from the beginning of the process.

41.     Under the revamped Sexual Misconduct Policy, the hearing was held with a single hearing officer, who was employed by ISU just like the Investigator. Upon information and belief, the Hearing Officer could speak with and question the Investigator while the accused was not permitted to question the investigator.

42.     At the time of Jane Doe's report against John Doe in late 2016, the policies and procedures for investigating and resolving student allegations of sexual misconduct were set forth in the 2016 Code of Student Conduct's Sexual Misconduct Policy.

43.     Gender bias against male students accused of sexual misconduct was built into the Sexual Misconduct Policy used in John Doe's case. That Policy was the result of a deliberate effort on the part of the University and the Office of Student Conduct to protect female complainants from discomfort, while not providing the same for male's accused. In setting out to accommodate female students, the University deliberately created an inequitable process, in which female students were presumed to be "survivors" and "victims" of sexual assault simply on the basis of having made an accusation and male students are presumed to be "perpetrators."

44.     Like many other colleges and universities, ISU revamped its Title IX sexual misconduct policies and procedures in response to the Department of Education's Office for Civil Rights' ("OCR") "Dear Colleague" Letter issued in April 2011, and amid mounting student

activist and media criticism of University's, across the nation, perceived mishandling of sexual misconduct allegations brought by female complainants. The OCR is the governmental office charged with enforcing Title IX and its implementing regulations.

45.    In its overzealous response to the Dear Colleague Letter, the University has ignored widespread criticism of the Dear Colleague Letter from a broad range of groups, including: (1) the American College of Trial Lawyers, which issued a report stating that accused students are deprived of "fundamental fairness" under OCR's Dear-Colleague system of investigation and adjudication; (2) the ABA Criminal Justice System Due Process Task Force, a committee consisting of all interested parties (including victim advocates), which issued a report recommending changes in college procedures in the interest of fundamental fairness for accused students; and (3) law professors from Harvard and other leading law schools who have protested the lack of fundamental fairness in OCR's Dear Colleague Letter policies and procedures. (*See* https://www.nacua.org/docs/default-source/new-cases-and-developments/New-Cases-April-2017/white-paper-re-sexual-assault-investigations.pdf; and https://www.americanbar.org/content/dam/aba/publications/criminaljustice/2017/ABA-DueProcess-Task-Force-Recommendations-and-Report.authcheckdam.pdf). The 28 Harvard Law professors stated that OCR's directives "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." (https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexualharassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html).

46.    Before the University revamped its Sexual Misconduct Policy, the parties involved in ISU's proceedings for resolving student sexual misconduct allegations had a full, equal, and fair opportunity to question and confront all witnesses at a hearing, and the Hearing

Officer made its decision based on the parties' and witnesses' active participation in the hearing(s).

47.     Under the revamped Sexual Misconduct Policy, the University adopted a single investigator process that drastically changed the nature of the hearing. Under the revamped Policy, the Title IX Investigators able to interview witnesses and submit reports of findings from the interviews as substantive evidence against the accused without the accused being able to interview the same witnesses and submit his own report regarding the same as his own substantive evidence to be considered by the hearing officer.

48.     ISU used the preponderance of the evidence standard to determine responsibility for violations of the Policy. This meant that the investigator and hearing officer must determine more likely than not what occurred.

49.     Students involved in the process could be accompanied by one advisor during the investigation and hearing, but the advisor could not speak, write, or otherwise communicate on behalf of the student. In cases alleging sexual misconduct, the advisor could be an attorney who was still limited to a supportive and not participating role.

50.     Thus, even in cases involving allegations of sexual assault with serious consequences for the accused, the accused's attorney could not speak, write, or otherwise actively participate on behalf of the accused in any stage of the process.

51.     Every phase of the revamped Policy, including the investigation and the hearing, was skewed to favor female complainants and to disfavor accused male students.

52.     Under the revamped Sexual Misconduct Policy, a single investigator employed and trained by the University was given complete control and discretion in the investigation.

53.      The investigator interviewed the witnesses behind closed doors and decided what questions to ask them. The investigator decided what witnesses (if any) to interview, what questions to ask them, and what "evidence" to collect. The accused never knew what the complainant or any witnesses actually said in the investigation or what evidence had been gathered, but only knew what the investigator chose to tell him in the investigator's Report.

54.      The revamped Sexual Misconduct Policy was applied in John Doe's case. As a result, he had to piece together what he was accused of doing and he was only provided a summary of the investigators report approximately two weeks prior to his adjudicatory hearings.

55.      ISU's Hearing Officer was employed by the University, in a similar fashion as ISU's Title IX Investigator, and was able to meet with the investigator to ask questions. However, the accused was not permitted to do so and was not told what the investigator was asked or said. This denied John Doe due process.

56.      Upon information and belief, the accused had no right to object to the Hearing Officer on conflict of interest grounds, despite the Hearing Officer working for the University and directly with the Title IX Investigator that was in charge of investigating John Doe, which created a clear conflict of interest that should have been disclosed to John Doe in advance of the hearing.

## C.      ISU's Code of Student Conduct and other publications

57.      In prior years, ISU's Code of Student Conduct and other publications promulgated certain University regulations, such as: "Illinois State University recognizes that it must create an environment where each person's rights, safety and dignity will be valued and respected . . . Students deserve to be free from harassment or physical abuse in any form. Especially intolerable are acts directed against individuals based upon race, religion, ethnicity,

*gender* (emphasis added) age, disabled status, or sexual orientation". (Exhibit B – ISU's 2012
Code of Student Conduct, p 5). "Illinois State University recognizes that it must create an
environment where each student will be free to pursue her or his academic interests without
interference from others". (Exhibit B, p 8).

58.     ISU's Code of Student Conduct and other publications also promulgated certain
Student Rights, such as: "Students have a right to expect that all disciplinary proceedings will be
handled fairly. All Illinois State University Students shall be granted the following due process
rights: . . . the right to a hearing by an unbiased administrative hearing officer . . . the right to
question all parties through the administrative hearing officer . . . (Exhibit B, p 13) . . . the right
to receive a written copy of the reports stating the circumstances and allegations involved. This
information shall generally be provided to the student when he or she is notified of the charges"
(Exhibit B, p 14).

59.     In 2016, ISU's Code of Student Conduct and other publications promulgated
further that "for the purpose of this Code, the procedures used to enforce University expectations
assure written notice and a hearing before an objective decision maker. No student will be found
in violation of University regulations without information demonstrating that there is a
preponderance of information that a policy violation occurred, and if found in violation,
sanctions imposed will be proportionate to the severity of the violation . . ." (Exhibit C – ISU's
2016 Code of Student Conduct, p 2).

60.     ISU's 2016 Code of Student Conduct promulgated further that "In cases where an
interim suspension is removed or a suspension is not a sanction following the student conduct
process, effort will be made to restore the student formerly on interim suspension to academic
wholeness" (Exhibit C, p 5).

61.     ISU's 2016 Code of Student Conduct and other publications further provided that "Student respondents are entitled to the following rights in the student conduct process: . . . the right to a hearing by an unbiased administrative hearing officer . . . in accordance with requirements of law . . .the right to have an advisor . . . the right to hear and respond to all information presented against the student. This includes the right to question all involved parties through an administrative hearing officer . . .  (Exhibit C, p 16).

62.     ISU's 2016 Code of Student Conduct and other publications further provided that "Student respondents are expected to adhere to the following responsibilities in the student code process: . . . Students will not take direction from advisors during the course of a proceeding, nor will advisors be permitted to script student responses and/or questions during a meeting or hearing" (Exhibit C, p 17)

**D.      John Doe and Jane Doe become friends and have Sexual Intercourse**

63.     John Doe was born in Illinois and has lived in the Chicago suburbs the majority of his life. He was raised in a loving family while he attended elementary and high school in the Chicago suburbs where he excelled in academics and extracurricular activities and especially in baseball.

64.     Prior to matriculating at Illinois State University in August of 2013, John Doe had an outstanding high school academic record and college admission test scores.

65.     Prior to deciding on ISU, John Doe was recruited by ISU to join ISU's baseball team. Despite having prospects to play baseball at other schools, John Doe chose to attend ISU and play for ISU's baseball team where he would spend the next four years of his life. Upon enrolling in ISU, John Doe was directed to the Illinois State University Code of Student Conduct

(the "Policy"), which outlined academic rules, student life rules, and student grievance procedures for all ISU students.

66.     At ISU, John Doe initially thrived where he received the Reggie award for student athletics by maintaining a GPA > 3.0 during his freshman year. After approximately 2 years, John Doe decided to resign from the baseball team and replace baseball with a business and leadership fraternity, Phi Beta Lambda where John Doe served as Chairman of the Professional Committee where he was responsible for coordinating events such as corporate tours and guest speakers and planned resume and speech critics.

67.     John Doe and Jane Doe met at a party during Homecoming week in October of 2016. This is when they formed a friendship and they had communications with each other during subsequent weeks whereby the parties discussed personal matters including that Jane Doe was dating a male college student who attended the University of Illinois.

68.     On or about November 6th, 2016, in the early morning hours, John Doe and Jane Doe both attended a party near the ISU campus but arrived separately. John Doe had consumed alcohol but was not intoxicated. Jane Doe, to John Doe's knowledge, had also consumed alcohol that evening.

69.     At one point during the party, Jane Doe asked John Doe to help her find her vehicle. John Doe escorted Jane Doe outside of the house where the party was being hosted to help Jane Doe locate her vehicle. While outside Jane Doe began to feel dizzy. The two stopped at John Doe's residence where the parties had sexual intercourse in John Doe's bedroom. Thereafter, John Doe left his bedroom and went downstairs to get a drink of water. Upon returning, John Doe found Jane Doe was still in his bed and the two spent the night together.

Upon awakening, John and Jane Doe had intercourse a second time and then Jane Doe left the residence at approximately 8:00 am.

70.     Later that morning John Doe texted Jane Doe at approximately 10:43 am, indicating he had a good time last night. Jane Doe texted John Doe back indicating that "I had a good time too (smiley face) . . ." and Jane Doe texted John Doe a few more times and asking "Tomorrow we still good to hang out?", and John Doe responds "Yeah most likely . . . " whereby Jane Doe responds "Sounds good (smiley face)."

71.     Later that day, Jane Doe went to the hospital and made a sexual assault report to a Normal Police Officer, at approximately 4:00 p.m., who advised Jane Doe that a Detective would likely follow-up with her at a later date. On November 15, 2016, a Normal Police Detective followed up with Jane Doe and on November 16, 2016 the Normal Police Detective contacted John Doe for an interview.

72.     On November 17, 2016, two Normal Police Detectives met with Johnson Law Group where the Detectives were shown text messages to and from John and Jane Doe and Johnson Law Group thoroughly explained that the sexual encounters between John and Jane Doe were consensual and that Jane Doe was likely to have claimed the sexual contact was not consensual because this is probably what Jane Doe told her boyfriend.

73.     Upon information and belief, the Detectives conducted a full investigation and forward their completed reports to both the McLean County State's Attorney's Office and ISU.

**E.     John Doe receives No-Contact/No-Trespass Orders from ISU; John Doe is suspended from the University prior to Title IX adjudicatory hearings.**

74.     On November 22, 2016, John Doe received an email from ISU Dean of Students, John M. Davenport, which was titled "No Contact Order – Open Immediately". The email

instructed John Doe that he is to have no contact with Jane Doe until further notice.

75.     The email provided further that: "For the purposes of this restriction, "contact" includes any form of communication between you and the aforementioned party, whether verbal or written, via personal contact, third party contact, telephone, e-mail, or any other medium (i.e., Facebook, Twitter, etc.). This restriction applies both on and off campus and extends outside of the Bloomington-Normal community. Additionally, I will also consider you as failing to comply this directive if you are within 25 feet of Jane Doe and choose to remain within that distance without taking reasonable steps to leave the area".

76.     On November 23, 2016 John Doe received an email from ISU Senior Specialist, Student Conduct and Conflict Resolution, Janice Blair, which contained a letter from ISU Dean of Students, John M. Davenport, which was titled "No Trespass Notice". The email/letter advised John Doe that "This letter is written to inform you that, effective immediately, you are restricted from entering or being present in, or around, certain Illinois State University intercollegiate athletic facilities, which include: Horton Field House and the Horton Pool. In addition to those facilities, you are also restricted from entering or being present in, or around the Linkins Dining Center."

77.     The email/letter provided further that: "this status means that you would be an unwelcome person and subject to arrest for criminal trespass in the event of your appearance in or within fifty feet of these areas. Be advised that this decision will be maintained as part of your disciplinary record. The Illinois State University Police Department, as well as the appropriate University staff for this area, will be informed of your status".

78.     The email/letter provided further that "Your failure to comply with this restriction to access these Illinois State University Athletic and Dining facilities will result in your arrest for

21

Criminal Trespass and possible incarceration. This restriction is effective as of this date, November 23,2016, for a period of 7 months or until disciplinary sanctions are resolved".

79.     On November 23, 2016, John Doe received another email from ISU Senior Specialist, Student Conduct and Conflict Resolution, Janice Blair, which contained a letter from ISU Dean of Students, John M. Davenport, which was titled "No Trespass Notice". The email/letter advised John Doe that "This letter is notice that Illinois State University intends to formally investigate an incident occurring on November 6, 2016 12:00AM implicating you . . . The purpose of this investigation is to gather information related to an alleged violation of University policies as enumerated in the Code of Student Conduct.

80.     The email/letter provided further that "we request you attend a meeting on December 2, 2016 10:00 AM . . . with Ashley Fritz . . . failure to attend the meeting at the scheduled date and time will result in a violation of the Code of Student Conduct (A6: Failure to Comply)."

81.     The email/letter provided further that "If this matter should proceed after the investigation, it will be sent to Student Conduct and Conflict Resolution to be handled by Senior Specialist Janice Blair . . . "

82.     On November 30, 2016, Johnson Law Group forwarded a letter to ISU by mail and via email to multiple ISU personnel advising that John Doe would comply with ISU's request to attend a meeting and that he and his father would be attending the meeting scheduled for December 2, 2016. The email/letter further advised ISU of a concern that a "No Contact/No Trespass" was entered against John Doe without any opportunity for him to be heard. The letter further advised ISU that John Doe is entitled to a "presumption of innocence" and that since he is

22

a senior at ISU, that "his future not be jeopardized or hindered". ISU did not respond to Johnson Law Group's letter.

83.    Upon information and belief, on or about December 1, 2016, ISU received notice from the McLean County Sexual Assault Task Force that "this report should be closed due to declined prosecution".

84.    In or about December John Doe was informed by several fellow students that Jane Doe was telling people detailed information relating to the complaint she made against John Doe,[2] as well as false information in order to vilify and defame John Doe. John Doe was troubled by the fact that such damning information had been spread to fellow students, teachers, and acquaintances. Nevertheless, John Doe made sure to comply with the instructions in the emails and letters that he had received from ISU including keeping the information pertaining to the student conduct process confidential pursuant to ISU's Code of Student Conduct (Exhibit C, p 19).

85.    As the fall progressed, John Doe began to realize that Jane Doe, individually and through her friends, had been spreading false accusations about him to a broad range of friends, members of the woman's swimming/diving team, sororities and fraternities. As a result, John Doe became increasingly isolated from his closest friends on campus.

86.    On December 15, 2016, John Doe received an email from ISU Dean of Students, John M. Davenport which was titled "No Contact Order – Open Immediately.  The email

---

[2] Jane Doe violated ISU's Code of Student Conduct which requires that "a complainant has the responsibility to keep confidential all information pertaining to the student conduct process (Exhibit C, p 19). Despite Jane Doe's violation of this provision, ISU did not charge Jane Doe. Upon information and belief, ISU's decision not to do so was gender based.

informed John Doe that he is instructed to have no contact with a second female student, Jane

Roe, until further notice.

87.     The email further provided that: "For the purposes of this restriction, "contact"

includes any form of communication between you and the aforementioned party, whether verbal

or written, via personal contact, third party contact, telephone, e-mail, or any other medium (i.e.,

Facebook, Twitter, etc.).  This restriction applies both on and off campus and extends outside of

the Bloomington-Normal community. Additionally, I will also consider you as failing to comply

this directive if you are within 25 feet of Jane Roe and choose to remain within that distance

without taking reasonable steps to leave the area".

88.     This second "No Contact Order" stemmed from a report from a friend of Jane

Doe and fellow ISU student, Jane Roe, regarding an alleged incident that occurred approximately

one year prior to Jane Doe's allegation.

89.     On December 15, 2017, John Doe received an email from ISU Deputy Title IX

Coordinator/Investigator Ashley Fritz, Student Affairs Title IX, which was titled "important

notice". The email advised John Doe that: "This letter is notice that ISU intends to investigate an

incident occurring on November 6, 2016 at your residence. 502 N. School St. Specifically, an

ISU student reported that you sexually assaulted her. The female student alleges she said no

multiple times and you engaged in nonconsensual sexual activity with her. The purpose of the

investigation is to gather information related to an alleged violation of University policies as

enumerated in the Code of Student Conduct. To this end we request you attend a meeting on

December 20, 2016 at 1:00 p.m. in Student Affairs Title IX Office. The Office is located in room

144 Bone Student Center. Your meeting is scheduled with the University's Title IX Coordinator,

Ashley Fritz. Your attendance at this meeting supersedes any and all other commitments you

may have scheduled at that time. Failure to attend the meeting at the scheduled date and time will result in a violation of the Code of Student Conduct (A6: Failure to Comply)".

90.     The email further provided that: "If this matter should proceed after the investigation, it will be sent to Student Conduct and Conflict Resolution to be handled by Senior Specialist Janice Blair . . .".

91.     On or about December 15, 2016, the McLean County State's Attorney's Office notified Johnson Law Group that the McLean County Sexual Assault Task Force declined pursuing any charges against John Doe approximately two weeks earlier. During this conversation the McLean County State's Attorney's Office expressed its dismay with ISU referring the case for review.

92.     On or about December 15, 2016, John Doe received a letter from ISU's Vice President for Student Affairs, Levester Johnson which provided that "I am sufficiently concerned about your reported behavior that it appears that an interim suspension from ISU may be necessary to ensure the safety of the ISU community". The letter provided further that this suspension would include barring John Doe from being on campus, attending classes, facilities, etc. The letter also reminded John Doe about the No Trespass/No Contact/ No Retaliation orders.

93.     On December 19, 2017, Johnson Law Group forwarded another letter to ISU by mail and via email, to multiple ISU personnel, outlining our previous position and questioning the timing of the new allegation being made by a friend of the first accuser. This letter was critical of ISU's handling of the process with no presumption of innocence, and suggested that ISU take action against Jane Doe for making a false police report. The letter further advised ISU

that we expect John Doe's future to not be jeopardized. ISU did not respond to Johnson Law

Group's letter (2nd time).

94.     On December 20, 2017 John Doe and his father attended the previously scheduled

meeting at ISU with ISU's Deputy Title IX Coordinator, Ashley Fritz.

95.     On or about December 22, 2017, John Doe received another letter from ISU Vice

President for Student Affairs, Levester Johnson.  The letter notified John Doe of an interim

suspension that ISU was imposing on John Doe. The letter advised that "Based on all the

information I have available to me at this time, I have decided that, effective immediately, you

are hereby issued an interim suspension from Illinois State University".  The letter provided

further that "an interim suspension means that you are denied access to all campus facilities,

including all classes, dining facilities, athletic facilities, campus buildings and grounds, parking

areas, and all University-related activities or privileges for which you might otherwise be

eligible". The letter, again, referenced ISU No Contact Orders against Jane Doe and Jane Roe

even away from school grounds. This letter included the threat of arrest if it violated.

96.     ISU took this extreme and unwarranted action without first affording

John Doe his right to a hearing and despite Johnson Law Group reminding ISU, in writing, on

two occasions, that John Doe is presumed innocent. Moreover, ISU took this extreme and

unwarranted action after ISU received notice from the McLean County Sexual Assault Task

Force that McLean County had closed the matter due to its decision to decline prosecution.

97.     Upon receiving the latest letter from ISU, John Doe was shocked and distressed

about being suspended prior to having an opportunity to see a complaint or to fully know the

allegations that were being made against him. At this point, John Doe could only speculate about

what the specific allegations might be.

26

98.     On January 12, 2017, John Doe received two separate letters from ISU Senior Specialist, Dean of Students, Justin Stern, indicating that" This letter is to inform you that the Student Conduct and Conflict Resolution (SCCR) has received a complaint[3] regarding possible violations of the Code of Student Conduct. See attached incident report for further details."

99.     The letter further provided that "You are required to attend a mandatory appointment with me January 19, 2017 12:30 pm. at 120 Student Services Building to discuss this situation. At this time we will discuss your response to the charges above, and determine if a hearing will be necessary to resolve the complaint". If you choose to accept responsibility for violations of the Code of Student Conduct, we can then discuss any sanctions that may be appropriate and we will be able to resolve your case during this meeting. Otherwise, we will discuss the rights and responsibilities you have in the administrative hearing process. The sections relevant to this incident are 2016COSC D Gender Based Harassment, or violence/D1. Sexual Harassment; 2016 COSC D Gender Based Harassment, or Violence/D2 Sexual Misconduct/Violence.

100.     The letter further provided "Should we be unable to reach a resolution, the case will be referred to a formal administrative hearing with Janice Blair to occur on January 26, 2017 at 1:30 pm."

101.     On January 18, 2017, Johnson Law Group telephoned ISU's Justin Stern and advised ISU that John Doe was opting out of the January 19th meeting and was requesting to move forward with the formal hearing scheduled for January 26, 2017.

---

[3]This was the first time that John Doe was notified that SCCR had received a complaint, which was, approximately 20 days after ISU had suspended John Doe. This was also the first time that John Doe was provided with the details of the accusers' allegations and a summary of the witnesses that were interviewed.

102. On January 26, 2017, John Doe and his Advisor/Attorney with Johnson Law Group, attended two hearings at ISU and the following transpired at the two separate Title IX cases:

(A) Case#02736 – ISU's Janice Blair advised that she had read the written reports that had been submitted (by NPD Detective Brad Park and ISU's Ashley Fritz). Upon information and belief, Park and Fritz's reports were submitted as substantive evidence at the hearing. John Doe was not allowed the opportunity to object to the admission of the written reports nor examine any of the 10 witnesses submitted through the reports. Blair called Jane Doe as a witness who testified about how she was not truthful (in her texts) about drinking on 11/6/2016. John Doe was not allowed to cross examine Jane Doe, rather, he was only allowed to ask ISU's Janice Blair to ask Jane Doe questions. Jane Doe provided inconsistent statements as to her intoxication level in comparison to other witness statements that were included in Park and Fritz reports. [4] ISU's Blair called Detective Park as a witness and had Park testify about what Jane Doe had told Officer Street at an initial interview (hearsay) and what Jane Doe told Park (hearsay) during a later interview of her. John Doe was not able to object or cross examine the officers. John Doe testified during the 2.5 hour hearing and provided consistent and credible testimony throughout the hearing. Throughout the hearing, ISU disallowed John Doe's attorney from participating in the hearing other than as a side line advisor to John Doe, including, but not limited to disallowing John Doe's attorney from: providing an opening statement,

---

[4] Jane Doe committed a violation of ISU's Code of Student Conduct by not being truthful about her level of intoxication. Jane Doe knowingly provided false or inaccurate information in violation of the Code (Exhibit C, VI 5a, p 7; and VI 11b, p 9). Despite this, ISU elected not to bring misconduct charges against Jane Doe and this appears to be a gender based decision.

cross examining witnesses, presenting witnesses, objecting to the submission of uncontestable police and investigative reports as substantive evidence, making a closing argument, etc.

(B)     Case #03050 – Jane Roe failed to show up at the hearing.[5]Upon information and belief, ISU was previously aware that Jane Roe would not show up for the hearing. Despite, ISU having notice that Jane Roe would not appear at the hearing and despite Jane Roe's actual failure to appear, ISU proceeded with the hearing against John Doe anyway and conducted the hearing by admitting investigative reports that included statements of individuals that had been interviewed by ISU's deputy title IX Coordinator/Investigator Fritz. John Doe was not allowed the opportunity to cross examine his accuser, Jane Roe, or the three other witnesses that ISU had submitted at the hearing through the introduction of ISU' investigative reports as evidence. John Doe was only allowed to provide an opening statement which then subjected himself to cross examination by ISU's Janice Blair. John Doe provided consistent and credible testimony throughout the hearing. Throughout the hearing, ISU disallowed John Doe's attorney from participating in the hearing other than as a side line advisor to John Doe, including: disallowing John Doe's attorney from: providing an opening statement, cross examining witnesses, presenting witnesses, objecting to the admission of

---

[5] Jane Roe committed violations of ISU's Code of Student Conduct by failing to participate (Exhibit C, VII B, p 17) and by failing to attend the hearing (Exhibit C VII 11a, p 9). Despite this, ISU elected not to bring misconduct charges against Jane Roe and this this appears to be a gender based decision.

police and investigative reports as substantive evidence, making a closing argument, etc.

103.    On February 1, 2017: John Doe received an emailed letter from ISU's Janice Blair that provided ISU's findings from the two Title IX adjudicatory hearings:

(A)    Case#02736 – Jane Doe – ISU's findings were that Jane Doe provided consistent statements that the sexual intercourse with John Doe was nonconsensual. ISU's findings further indicated that John Doe made a statement that all sexual contact was consensual and that since there was no independent information to corroborate or dispute either parties' statements, it was determined that there was insufficient information to support the allegations that nonconsensual contact had occurred between the parties, as alleged. As such it is determined that John Doe did not violate the Code of Student Conduct regulation D1 or D2" – finding in John Doe's favor.

(B)    Case#03050 – Jane Roe – ISU's findings provided that "based upon the information provided at the time of the hearing and in the incident and investigative reports, there is not a preponderance of information to find John Doe (sic) violated the following charges of the Code of Student Conduct: D1 and D2" – finding in John Doe's favor.

104.    Thereafter, although ISU provided both Jane Doe and Jane Roe the opportunity to appeal the findings, which constituted double jeopardy for John Doe, neither of the accusers elected to appeal.

105.    Subsequent to the completion of the January 26th hearings and subsequent to the February 1st findings letter, ISU failed to promptly undo the seven month restrictions that barred

John Doe from certain ISU facilities and/or undo John Does' suspension that was imposed upon him beginning on December 22, 2016.

106.    On February 10, 2017, Johnson Law Group emailed/lettered ISU to seek clarification as to John Doe's status at the University. The letter further advised ISU of our concern about the disparity between how swiftly ISU sent correspondence to John Doe informing him of the No Contact/No Trespass/Suspension pre-hearing sanctions and the Notice to attend the hearing itself, while, in stark contrast, ISU failed to provide John Doe with notification, after he was vindicated, of his status at the University or whether he could even go back to attending classes. ISU did not respond to Johnson Law Group's email (3ʳᵈtime).

107.    On February 14, 2017, since ISU had not responded to Johnson Law Group's inquiry about the status of John's Doe's restrictions and suspension, John Doe emailed ISU's Janice Blair advising that "I have said all along that I was falsely accused and been looking forward to this being over". The email further inquired about his status with ISU and whether the matter had been closed.

108.    On February 14, 2017 John Doe received a responsive email from ISU's Janice Blair indicating that "No appeals packets have been submitted for your cases. At this point that means that the decisions from the formal hearings are final. I communicated this information to the Vice President of Student Affairs office and Dean of Student's office and my understanding is that you will receive an official notification regarding the status of your previously issued interim suspension, campus restriction, and contact restrictions."

109.    On February 23, 2017, John Doe received a certified letter from ISU's Vice President of Student Affairs, Levester Johnson  (letter dated 2/16/17, with postage dated 2/21/17)

indicating that the previously imposed suspension, campus restrictions and contact restrictions were rescinded.

110.   ISU's rescission did not offer any remedy to the fact that the charges, restrictions and suspension, that ISU leveled against John Doe in the Fall of 2016, caused John Doe to completely fail his classes in the Fall of 2016 and barred John Doe from attending classes in the beginning of the Spring of 2017. Nor did ISU offer to expunge the disciplinary charge, the restrictions or the interim suspension from John Doe's academic record, and upon information and belief, the negative marks remain to this day.

**F.**     **John Doe's Damages**

111.   John Doe lost almost all of his friends due to ISU's unfair treatment and had to take a job working at Menards's for near minimum wage near his hometown to make ends meet after he was unduly suspended from ISU.

112.   Like all respondents at ISU, who are habitually male, John Doe's rights to fair process were violated by the application of a discriminatory sexual misconduct policy which denied him the right to a fair and impartial hearing prior to the imposition of sanctions, subjected him to double jeopardy, and resulted in extreme and unwarranted sanctions including being barred from portions of campus and being suspended for two (2) months, all of which collectively caused John Doe a wealth of damages.

113.   The University restrictions placed upon John Doe and the suspension rendered by ISU against John Doe for unfounded allegations of sexual misconduct caused him severe damages including the monies spent by John Doe and his family, as well as the time that John Doe wasted devoting time to his education at ISU, damages to his good name, reputation, honor, and integrity, and a loss of future professional and career opportunities.

114.    As a result of ISU's actions, John Doe's academic and professional prospects have been shattered and his economic future has been severely compromised.

115.    Through its deeply unfair sexual misconduct policy, ISU has: branded John Doe as a sexual offender; caused John Doe to fail all of his classes during the Fall of 2016; denied John Doe the ability to attend classes in the Spring of 2017; and interrupted John Doe's ability to graduate from ISU.

116.    John Doe will be stigmatized for years to come by the fact that ISU charged him with sexual assault. He will have no choice but to disclose the charges whenever he is asked whether he was the subject of a college disciplinary proceeding, in professional licensure applications, in government employment applications, and in other employment or prospective employment circumstances.

117.    Although John Doe was acquitted at the two adjudicatory hearings, the charges and the interim suspension that ISU meted out will continue to exist in John Doe's college record. [6] This has caused continuing negative blemishes in John Does' academic record making admission as a transfer student to another college or university of the same or similar caliber to ISU unlikely if not impossible and severely disadvantages John Doe in future academic, professional, and career opportunities.

118.    Besides the irreversible damage to his college, post-graduate, employment, and earning prospects, the University's charges of sexual assault have a lasting social and

---

[6] Pursuant to the information in ISU's letters referenced supra and as promulgated by ISU's Code of Student which provides "all student conduct records, both adjudicatory and non-adjudicatory, are maintained by SCCR for a period of seven years from the date of creation . . . " (Exhibit C, X A, p38).

reputational harm. The University's charges against John Doe as a sexual offender will continue to have dramatic, life-altering consequences for him.

119.    ISU's conduct has caused John Doe severe emotional and physical distress, including panic attacks, loss of appetite, an inability to sleep through the night, nightmares, and anxiety, all requiring counseling.

**G.    2017 Changes Under the Trump Administration: Withdrawal of the "April 2011 Dear Colleague Letter" and Implementation of a "New Dear Colleague Letter"**

120.    In 2017, the political tides changed with President Donald Trump's Administration making a move to rescind Obama-era guidance on how campuses handle sexual assault investigations.

121.    On July 13, 2017 Secretary of Education Betsy DeVos announced that after days of controversy surrounding meetings with stakeholders in the campus sexual assault debate, that she wanted to help both victims of assault and those who have been falsely accused of rape — a striking departure from the rhetoric of the Obama administration, which has focused primarily on survivors. DeVos strongly suggested that she was planning to overhaul the way that the government deals with campus sexual assault, calling the current system of enforcing Title IX broken. "We need to get this right, we need to protect all students, and we need to do this quickly," DeVos told reporters. (See  https://www.buzzfeed.com/mollyhensleyclancy/betsy-devos-wants-to-quickly-change-the-way- hegovernment?utm_term=.vuWMAM0xB#. bcaZyZBEQ )

122.    On September 7, 2017, Education Secretary Betsy DeVos spoke at George Mason University where she vowed to replace what she branded the "failed system" of campus sexual assault enforcement, to ensure fairness for victims and the accused. Instead of working with

34

schools …, DeVos said, "the prior administration weaponized the Office for Civil Rights." "We must do better because the current approach isn't working." "Every survivor of sexual misconduct must be taken seriously," she said. "Every student accused of sexual misconduct must know that guilt is not predetermined. "These are non-negotiable principals". DeVos criticized a key element of Obama's policy: that schools use a standard known as "preponderance of the evidence" when weighing sexual misconduct cases.

(See https://www.washingtonpost.com/news/grade-point/wp/2017/09/07/protesters-gather-anticipating-devos-speech-on-campus-sexual-assault/?utm_term=.36b6039051ca).

DeVos announced further that the Trump administration would roll back Obama's "failed" Title IX guidance on sexual assault and harassment. Educators, she said, have complained that the current system amounts in many cases to "kangaroo courts," in which the rights of the accused are given short shrift unless they can afford to hire legal representation to pursue complaints. "No student should be forced to sue their way to due process," she said.

(See https://www.usatoday.com/story/news/2017/09/07/devos-revamp-title-ix-guidance-school-sex-assault/642368001/http://www.cnn.com/2017/09/07/politics/betsy-devos-education-department-title-ix/index.html .DeVos announced further "the truth is that the system established by the prior administration has failed too many students," she said during remarks at George Mason University in Virginia. "Survivors, victims of a lack of due process and campus administrators have all told me that the current approach does a disservice to everyone involved."

(See https://www.nbcnews.com/news/us-news/betsy-devos-overhaul-obama-era-guidance-campus-sex-assault-n799471 ).

123.    On September 22, 2017, Education Secretary Betsy DeVos scrapped a key part of government policy on campus sexual assault, saying she was giving colleges more freedom to

balance the rights of accused students with the need to crack down on serious misconduct. The move, which involved rescinding two sets of guidelines several years old, was part of one of the fiercest battles in higher education today, over whether the Obama administration, in trying to get colleges to take sexual assault more seriously, had gone too far and created a system that treated the accused unfairly. The most controversial portion of the Obama-era guidelines had demanded colleges use the lowest standard of proof, "preponderance of the evidence," in deciding whether a student is responsible for sexual assault, a verdict that can lead to discipline and even expulsion. On September 22, 2017, the Education Department said colleges were free to abandon that standard and raise it to a higher standard known as "clear and convincing evidence." In announcing the change, the latest in a widespread rollback of Obama-era rules by the Trump administration, the department issued a statement saying that the old rules "lacked basic elements of fairness." (See https://www.nytimes.com/2017/09/22/us/devos-colleges-sex-assault.html ).

124.    On September 22, 2017, the Department of Education issued a press release that issued "New Interim Guidance on Campus Sexual Misconduct" and withdrew the widely criticized April 2011 Dear Colleague Letter:

(A)    "Building on her remarks from September 7, 2017, regarding the Department's commitment to protecting all students from discrimination, today U.S. Secretary of Education Betsy DeVos announced the release of a "new interim Q&A" for schools on how to investigate and adjudicate allegations of campus sexual misconduct under federal law."

(B)    "This interim guidance will help schools as they work to combat sexual misconduct and will treat all students fairly," said DeVos. "Schools must continue

36

to confront these horrific crimes and behaviors head-on. There will be no more sweeping them under the rug. But the process also must be fair and impartial, giving everyone more confidence in its outcomes."

(C)     "In the coming months, the Department intends to engage in rulemaking on Title IX responsibilities arising from complaints of sexual misconduct. The Department will solicit comments from stakeholders and the public during the rulemaking process, a legal procedure the prior administration ignored".

(D)     "In the interim, the newly released Q&A on Campus Sexual Misconduct explains the Department's current expectations of schools, and the Department will continue to rely on its Revised Sexual Harassment Guidance, which was informed by a public comment process and issued in 2001, as well as the Dear Colleague Letter on Sexual Harassment issued on January 25, 2006."

(E)     "In the coming months, hearing from survivors, campus administrators, parents, students and experts on sexual misconduct will be vital as we work to create a thoughtful rule that will benefit students for years to come. We also will continue to work with schools and community leaders to better address preventing sexual misconduct through education and early intervention," DeVos added.

(F)     "The Department of Education is also withdrawing the Dear Colleague Letter on Sexual Violence dated April 4, 2011, and the Questions and Answers on Title IX Sexual Violence dated April 29, 2014. The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness".

37

(G)     DeVos concluded, "As I said earlier this month, the era of rule by letter is over.

The Department of Education will follow the proper legal procedures to craft a

new Title IX regulation that better serves students and schools."

(See https://www.ed.gov/news/press-releases/department-education-issues-new-interim-

guidance-campus-sexual-misconduct.)

125.    On September 22, 2017, Candice Jackson, Acting Assistant Secretary for Office

of Civil Rights (OCR) U.S. Department of Education (DOE), issued a "New" Dear Colleague

Letter (Exhibit D) that read:

(A)     "The purpose of this letter is to inform you that the Department of Education is

withdrawing the statements of policy and guidance reflected in the following

documents: • Dear Colleague Letter on Sexual Violence, issued by the Office for

Civil Rights at the U.S. Department of Education, dated April 4, 2011. •

Questions and Answers on Title IX and Sexual Violence, issued by the Office for

Civil Rights at the U.S. Department of Education, dated April 29, 2014."

(B)     "These guidance documents interpreted Title IX to impose new mandates related

to the procedures by which educational institutions investigate, adjudicate, and

resolve allegations of student-on-student sexual misconduct. The 2011 Dear

Colleague Letter required schools to adopt a minimal standard of proof—the

preponderance-of-the-evidence standard—in administering student discipline,

even though many schools had traditionally employed a higher clear-and-

convincing-evidence standard. The Letter insisted that schools with an appeals

process allow complainants to appeal not-guilty findings, even though many

schools had previously followed procedures reserving appeal for accused

38

students. The Letter discouraged cross-examination by the parties, suggesting that
to recognize a right to such cross examination might violate Title IX. The Letter
forbade schools from relying on investigations of criminal conduct by law-
enforcement authorities to resolve Title IX complaints, forcing schools to
establish policing and judicial systems while at the same time directing schools to
resolve complaints on an expedited basis. The Letter provided that any due-
process protections afforded to accused students should not "unnecessarily delay"
resolving the charges against them."

(C)     "Legal commentators have criticized the 2011 Letter and the 2014 Questions and
Answers for placing "improper pressure upon universities to adopt procedures
that do not afford fundamental fairness." As a result, many schools have
established procedures for resolving allegations that 'lack the most basic elements
of fairness and due process, are overwhelmingly stacked against the accused, and
are in no way required by Title IX law or regulation."

(D)     "The 2011 and 2014 guidance documents may have been well-intentioned, but
those documents have led to the deprivation of rights for many students—both
accused students denied fair process and victims denied an adequate resolution of
their complaints. The guidance has not succeeded in providing clarity for
educational institutions or in leading institutions to guarantee educational
opportunities on the equal basis that Title IX requires. Instead, schools face a
confusing and counterproductive set of regulatory mandates, and the objective of
regulatory compliance has displaced Title IX's goal of educational equity."

39

(E)      "The Department imposed these regulatory burdens without affording notice and
the opportunity for public comment. Under these circumstances, the Department
has decided to withdraw the above-referenced guidance documents in order to
develop an approach to student sexual misconduct that responds to the concerns
of stakeholders and that aligns with the purpose of Title IX to achieve fair access
to educational benefits. The Department intends to implement such a policy
through a rulemaking process that responds to public comment. The Department
will not rely on the withdrawn documents in its enforcement of Title IX. "

(F)      "The Department refers you to the Q&A on Campus Sexual Misconduct, issued
contemporaneously with this letter, and will continue to rely on its Revised
Sexual Harassment Guidance, which was informed by a notice-and-comment
process and issued in 2001, as well as the reaffirmation of that Guidance in the
Dear Colleague Letter on Sexual Harassment issued January 25, 2006. As always,
the Department's enforcement efforts proceed from Title IX itself and its
implementing regulations."

(G)      "In the forty-five years since the passage of Title IX, we have seen remarkable
progress toward an educational environment free of sex discrimination. That
progress resulted in large part from the vigorous enforcement of Title IX by the
Office for Civil Rights at the Department of Education. The Department remains
committed to enforcing these critical protections and intends to do so consistent
with its mission under Title IX to protect fair and equitable access to education.
The Department has determined that this letter is a significant guidance document
under the Final Bulletin for Agency Good Guidance Practices of the Office of

40

Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This letter does not

add requirements to applicable law."

126.   The "New Dear Colleague Letter" did away with the prior requirements for

Universities to move forward with a presumption of Guilt. Most notably, the New Dear

Colleague Letter allows Universities to deviate from the previously required relatively

low burden of proof—"more likely than not"—in cases involving sexual misconduct, including

sexual assault. The New Letter and Guidelines no longer encourage a University to focus on

"minimizing the burden on the complainant," transferring alleged perpetrators, if necessary,

away from shared courses or housing, no longer focusing on victim advocacy, and the Letter

withdrawals the right complainants have to appeal a decision, which amounts to double jeopardy

for an accused student.

## COUNT I

### (42 U.S.C. § 1983: Denial of Fourteenth Amendment
### Due Process Against Defendant ISU)

127.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

128.   The Fourteenth Amendment to the United States Constitution provides that no

state shall "deprive any person of life, liberty, or property, without due process of law." In this

case, Defendants are state actors subject to the Fourteenth Amendment. Section 1983 of Title 42

of the U.S. Code provides in pertinent part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit

41

in equity, or other proper proceeding for redress. . . ."

129.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

130.     On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

131.     Reversing previous federal policy, the 2011 Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

132.     For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(A)     Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(B)     Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(C)     Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(D)     Required to apply a preponderance of the evidence standard when adjudicating

such allegations (whereas previously colleges frequently applied higher

evidentiary standards, such as the clear and convincing evidence standard);

(E)     Required not to allow cross-examination by the accused student;

(F)     Required or strongly encouraged to suspend/expel students that the college finds

to have engaged in unconsented-to sexual intercourse with another student.

133.    Since 2011, the United States has consistently reaffirmed and adhered to the

threat of substantial monetary penalties made in the Dear Colleague Letter. For example, in July

2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would

strip federal funding from any college found to be non-compliant with the requirements of the

Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

134.    Upon information and belief, since 2011, ISU has acted in response to the federal

government's threat that colleges refusing to comply would be found in violation of Title IX and

be subject to extremely substantial, and in fact crippling, monetary penalties. Therefore, ISU has

a pecuniary interest in the outcome of the adjudication of sexual assault complaints, because it

could lose federal money if it finds the respondent "Not Responsible." ISU does not face the

same risk of pecuniary loss if it finds the respondent "Responsible."

135.    Indeed, demonstrating its attempted compliance with the 2011 Dear Colleague

Letter, ISU's Clergy Reports reveal that the number of forcible sex offenses reported at ISU

increased considerably from 7 reported instances in 2014, to 15 reports in 2015, and 42 reported

incidents in the last four months of 2016.

136.    The Dear Colleague Letter has resulted in significant action and legal

consequences. Former Assistant Secretary for the Office of Civil Rights Catherine Lhamon

recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

137.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools." Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

138.    In fact, former Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government." Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." (http://www.si.com/collegefootball/2016/10/20/title-ix-sexual-assault-explained)

139.    Accordingly, ISU was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

140.    ISU applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the sexual assault complaints against John Doe.

Accordingly, when ISU investigated and adjudicated the sexual misconduct complaints against John Doe, and imposed sanctions of: "No Contact / No Trespass / Campus Restrictions / Suspension on John Doe, ISU was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

44

141. In the course of its investigation and adjudication, ISU flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

142. Defendant ISU deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his right to be promptly informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; and his right to question and challenge the credibility of any adverse witnesses.

143. As a result, Defendant ISU failed to provide Plaintiff with the basic due process protections, that they are required to provide to students accused of sexual misconduct, in violation of the 14th Amendment.

144. Based on the foregoing, ISU was a State actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the complaints against John Doe.

145. As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

146. Accordingly, Defendant ISU is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

147. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

45

148.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements.

### COUNT II
### (Violation of Title IX of the Education Amendments of 1972 Against All Defendants)

149.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

150.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

151.    No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

152.    Title IX of the Education Amendments of 1972 applies to a school or institution if any part of that school receives federal funds and ISU is a public University that receives federal funding.

153.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

154.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations there under. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

155.   Even the Obama Administration's DOE ostensibly recognized that the procedures adopted by a school such as Defendant ISU covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

156.   The Obama Administration's DOE recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

157.   Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim generally asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

158.   A "severity of penalty/selective initiation" occurred in this case because John Doe was innocent despite being wrongly accused to have committed sexual assault, wrongfully subjected to the adjudication process, wrongly sanctioned and, gender bias was a motivating factor.

159.   The denial of due process and the procedural errors made in this case resulted in a "severity of penalty/selective initiation" based on a flawed Title IX system utilized by ISU.

47

160.    Defendant ISU failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing into both Jane Doe and Jane Roe's allegations. The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe. The investigators and adjudicator were further biased by the University's erroneous pre-hearing conclusions that John Doe had engaged in misconduct, despite a lack of evidence or witness testimony to support either Jane Doe or Jane Roe's claims.

161.    Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, in the first Title IX case, where ISU relied in part on statements from approximately 10 witnesses included in the investigative reports, who were not physically produced at the hearing for cross-examination, John Doe was denied his right to cross examination. Again, in the second hearing, where Jane Roe was absent and John Doe was unable to conduct cross-examination of Jane Roe or the three additional witnesses that were submitted in investigative reports, John Doe was denied his right to cross examination in violation of due process of law. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 347 Ed. Law Rep. 705 (6th Cir. 2017).

162.    The totality of the circumstances establishes that Defendants acted out of gender bias in engaging in a "severity of penalty/selective initiation" process. From the moment Jane Doe reported her allegations to the University, Defendants barred John Doe from portions of the University's campus and, shortly thereafter, suspended John Doe from the entire University and separated him from his support system. Defendants presumed John Doe was guilty of the allegations lodged against him by Jane Doe and Jane Roe at or near the inception of the Title IX cases being opened against John Doe, and well before he was given the opportunity to present

his side at the ultimate adjudicatory hearings, and ISU imposed on him unduly harsh and unreasonable sanctions, despite a lack of evidence, lack of witness testimony, and lack of appearance or participation by Jane Roe at the second hearing.

163.    Upon information and belief, Defendants were pressured by the Obama Administration's Department of Education into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of due process considerations. Upon information and belief, Defendant ISU's mishandling of John Doe's cases was wrongfully affected by campus and federal pressure.

164.    The totality of circumstances establishes that Defendant ISU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

165.    Upon information and belief, the majority, if not all, of students that have been suspended or expelled from Defendant ISU for sexual misconduct have been male.

166.    Male respondents in sexual misconduct cases at Defendant ISU are discriminated against solely on the basis of gender. They are invariably subjected to selective prosecution, severe sanctions and are often found guilty, regardless of the evidence or lack thereof.

167.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, professional and career opportunities, economic injuries and other direct and consequential damages.

168.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and

disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

**COUNT III**
**<u>(State Law Breach of Contract against Defendant ISU)</u>**

169.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

170.    Defendant ISU created express and/or implied contracts when John Doe accepted an offer of admission to Defendant ISU and paid the tuition and fees.

171.    At all times relevant hereto, a contractual relationship existed between ISU and John Doe through John Doe's matriculation as a student at ISU, and through ISU's policies and procedures governing the student conduct process, including but not limited to the policies and procedures contained in the Code of Student Conduct, the Sexual Misconduct Policy, and related terms and provisions in bulletins, circulars, and on-line website information and regulations made available to John Doe as a tuition paying student.

172.    On his part, John Doe fully performed under his contracts with ISU and paid his tuition when due.

173.    Defendant ISU's policies provide that students are to have a fair and impartial disciplinary process and Defendant ISU breached express and/or implied contracts with John Doe, despite John Doe fully performing his obligations.

174.    Defendant ISU breached its contract with John Doe when it failed to conduct a fair and impartial process, including imposing a suspension prior to affording John Doe a hearing. At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to confront one's accuser, and cross-examine and challenge any

50

witnesses against him, all before an impartial and objective fact-finder. Thus, Defendants violated the contract with John Doe when they imposed a suspension and other sanctions against John Doe prior to a hearing and when ISU failed to afford John Doe a proper hearing on the accusations against him, and when ISU failed to promptly rescind the previously imposed sanctions after John Doe was vindicated at two adjudicatory Title IX hearings.

175.    The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant ISU utilized this standard of review, as recognized in its Code of Student Conduct and its Policy. Defendant ISU violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true after ISU had already imposed severe sanctions on John Doe. Defendant ISU therefore breached its contract with John Doe when it failed to provide John Doe with a fair and impartial hearing prior to the imposition of severe and warranted sanctions against John Doe, and when ISU failed to promptly rescind the previously imposed sanctions after John Doe was vindicated at the two Title IX hearings.

176.    ISU, through its agents assigned to John's case, was required to act in accordance with the aforementioned policies and procedures in addressing Jane Doe and Jane Roe's allegations against John Doe, and in conducting its investigation and Panel Hearing.

177.    For all the reasons set forth above, ISU has materially breached its contracts with John Doe by failing to comply with ISUs policies and procedures in the course of its investigation and adjudication of John Doe's case, and by arbitrarily and capriciously disregarding its contractual duties throughout the proceedings.

178.    Apart from breaching its express contractual obligations, ISU breached and violated the covenant of good faith and fair dealing implied in its contracts with John Doe by acting arbitrarily, capriciously, and in bad faith throughout John Doe's student conduct process, by acting in a manner inconsistent with John Doe's reasonable expectations of a fair and impartial process, by depriving him of the benefit of his bargained-for education, and by meting out a grossly disproportionate sanction of a suspension during his fourth year at the University.

179.    John Doe is entitled to recover damages for Defendant ISU's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

180.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements.

## COUNT IV
### (State Law Estoppel and Reliance against Defendant ISU)

181.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

182.    Defendant ISU's various policies constitute representations and promises that Defendant ISU should have reasonably expected to induce action or forbearance by John Doe.

183.    Defendant ISU expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant ISU would not tolerate, and John Doe would not

52

suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of ISU policies.

184.    John Doe relied to his detriment on these express and implied promises and representations made by Defendant ISU.

185.    Based on the foregoing, Defendant ISU is liable to John Doe based on estoppel.

186.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and professional opportunities, economic injuries and other direct and consequential damages.

## COUNT V
### Negligent Infliction of Emotional Distress

187.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

188.    ISU owed duties to John Doe, including, without limitation, a duty of reasonable care in providing a fair and impartial process for investigating and adjudicating the charges against him and from protecting him from foreseeable harm.

189.    John Doe reasonably relied upon ISU's duty to protect him from harm and participated in the Sexual Misconduct Policy's investigatory process and adjudication.

190.    The University breached its duty of care to John in multiple ways, including but not limited to the following:

(A)    instructing members of the ISU community to "believe the survivor," and creating a pervasive campus climate of gender-bias that presumes accused males are "perpetrators" and female accusers are "survivors" and victims," and that bolsters

53

student misconceptions about what constitutes sexual assault and consent (a

misconception that motivated Jane Doe and Jane Roe's accusations in John Doe's

case);

(B)    failing to take reasonable care in selecting, training, and supervising competent

and impartial coordinators, investigators, hearing officers and Title IX staff;

(C)    subjecting John Doe to an incompetent, gender-biased process in the investigation

and adjudication of his cases.

(D)    subjecting John to an appeal process that allowed the possibility of double

jeopardy violations which also unduly resulted in the unnecessary elongation of

his interim suspension;

191.    Such breach by ISU created an unreasonable risk of causing John Doe emotional

distress.

192.    As a direct and foreseeable consequence of ISU's actions, John Doe sustained

tremendous damages, including, without limitation, severe emotional distress, loss of

educational, professional and career opportunities, economic injuries, and other direct and

consequential damages.

193.    The emotional distress was severe enough that it has resulted in illness and/or

mental harm to John Doe, namely, John Doe's increased anxiety, depression, paranoia and

insomnia.

194.    ISU's extreme and outrageous conduct was the cause of John Doe's distress.

195.    Considering that John Doe's entire academic and future employment

opportunities would suffer as a result of its actions, ISU should have recognized that its conduct

involved an unreasonable risk of causing emotional distress and that that distress, if it were

caused, might result in illness or harm.

196.    John Doe's distress is reasonable in light of ISU's conduct. A reasonable person

would have suffered severe emotional distress under the same or similar circumstances.

197.    As a direct and proximate result of the above conduct, John Doe sustained

tremendous damages, including, without limitation, emotional distress, psychological damages,

loss of educational and professional opportunities, economic injuries and other direct and

consequential damages.

**COUNT VI**
**(Unfair or Deceptive Trade Practices)**

198.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

199.    The Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS

505/1, et seq.) provides comprehensive protection for consumers, borrowers, and businessmen

against fraud, unfair methods of competition, and unfair or deceptive practices in the conduct of

trade or business.

200.    Section 2 of the Consumer Fraud and Deceptive Business Practices Act (815

ILCS 505/2 provides:

> "Unfair methods of competition and unfair or deceptive acts or practices,
> including but not limited to the use or employment of any deception fraud, false
> pretense, false promise, misrepresentation or the concealment, suppression or
> omission of any material fact, with intent that others rely upon the concealment,
> suppression or omission of such material fact, or the use or employment of any
> practice described in Section 2 of the "Uniform Deceptive Trade Practices Act",
> approved August 5, 1965, in the conduct of any trade or commerce are hereby
> declared unlawful whether any person has in fact been misled, deceived or
> damaged thereby. In construing this section consideration shall be given to the
> interpretations of the Federal Trade Commission and the federal courts relating to
> Section 5 (a) of the Federal Trade Commission."

201.    Subsection 1(f) of the Consumer Fraud and Deceptive Business Practices

Act (815 ILCS 505/1(f) defines "trade" and "commerce" as follows:

"The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or
distribution of any services and any property, tangible or intangible, real,
personal, or mixed, and any other article, commodity, or thing of value wherever
situated, and shall include any trade or commerce directly or indirectly affecting
the people of this State."

202.    ISU was at all times relevant hereto, engaged in trade and commerce in the State

of Illinois, including, but not limited to, providing higher education courses to students in Illinois

in consideration of receiving payment for such.

203.    Illinois Courts have identified four elements that give rise to a private cause of

action under the Act: (1) a deceptive act or practice by the defendant; (2) the defendant intended

the plaintiff to rely on that deception; (3) the deception occurred in the course of conduct

involving trade or commerce; and, (4) actual damages to the plaintiff proximately caused by the

deception.

204.    The terms of the Act are liberally construed and a defendant's good faith in

making a representation to another is irrelevant.

205.    ISU has engaged in the following acts or practices that are deceptive or

misleading in a material respect, or committed deceptive acts or practices, which were aimed at

the consumer public at large, that were a representation or omission likely to mislead a

reasonable consumer acting reasonably under the circumstances: (a) by causing John Doe as well

as potential and current consumers of ISU's educational services to believe that ISU would

comply with its obligations, standards, policies, and procedures, electronic and/or printed copies

of which were provided to John Doe and are available to potential and current consumers of

ISU's educational services on ISU's Internet Website; and (b) by causing John Doe as well as potential and current consumers of ISU's educational services to believe that if they paid tuition and fees to ISU, that ISU would uphold its obligations, covenants and warranties to them described in its policies.

206.    Upon information and belief, ISU had no intention of following its own standards, policies, and procedures with respect to John Doe as a male accused of sexual assault when it restricted and suspended John Doe from the University despite John Doe being vindicated at two subsequent Title IX adjudicatory hearings.

207.    ISU's stated policies and procedures, together with its violations thereof with respect to John Doe as a male accused of sexual assault, show ISU's deceptive practices with respect to John Doe and with respect to prospective and current ISU male students accused of sexual assault at ISU.

208.    ISU's deceptive practices have had a broader impact on consumers at large, in that at all relevant times alleged in this Complaint ISU advertised to potential consumers of its educational services through its Internet Website and printed materials that ISU provided an environment and judicial processes free from gender bias against male students accused of sexual misconduct.

209.    Based on the foregoing facts and circumstances, ISU engaged in unfair or deceptive trade practices.

210.    As a direct, proximate, and foreseeable consequence of the foregoing, John Doe's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses,

loss of educational and professional opportunities, loss of future career prospects, and other
direct and consequential damages.

211.    Subsections 10(a) &(c) of the Consumer Fraud and Deceptive Business Practice
Act [815 ILCS 505/10(a) & (c) respectfully provide:

> "(a) Any person who suffers actual damage as a result of a violation of this Act
> committed by any other person may bring an action against such person. The
> court, in its discretion *may award actual economic damages or any other relief
> which the court deems proper* (emphasis added) . . ."

> "(c). Except as provided in subsections (f), (g), and (h) of this Section, in any
> action brought by a person under this Section, the Court may grant *injunctive
> relief where appropriate and may award, in addition to the relief provided in this
> Section, reasonable attorney's fees and costs* (emphasis added) to the prevailing
> party."

212.    As a result of ISU's actions John Doe is entitled to damages in an amount
to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and
disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands judgment against
Defendants as follows:

(i)    on the first cause of action for violation of constitutional due process under 42
U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in
an amount to be determined at trial, including, without limitation, damages to
physical well-being, emotional and psychological damages, damages to
reputation, past and future economic losses, loss of educational and professional
opportunities, and loss of future career prospects, plus prejudgment interest,
attorneys' fees (if applicable), expenses, costs and disbursements an injunction
enjoining violations of the Fourteenth Amendment in the process of investigating
and adjudicating sexual misconduct complaints;

(ii)   on the second cause of action for violation of Title IX of the Education
Amendments of 1972, a judgment against Defendants awarding John Doe
damages in an amount to be determined at trial, including, without limitation,
damages to physical well-being, emotional and psychological damages, damages

to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and punitive damages, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

(iii)     on the third cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements;

(iv)     on the fourth cause of action for state law estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements;

(v)     on the fifth cause of action for state law negligent infliction of emotional distress, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees (if applicable), expenses, costs and disbursements;

(vi)     on the sixth cause of action for state consumer fraud and deceptive business practices, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)     awarding John Doe such other and further relief as the Court deems just, equitable and proper, including, but not limited to, ordering ISU to expunge its charges and any derogatory information from John Doe's educational record.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Respectfully submitted,

/s/ Brendan Bukalski
Attorney for Plaintiff John Doe

Attorneys for the Plaintiff:

Brendan Bukalski
Bar No. 6288052
Johnson Law Group LLC
115 West Front Street
Bloomington, IL  61701
(309) 827-3670
brendan@jlawgroup.com

Mark D. Johnson
Bar No. 6211585
Johnson Law Group LLC
115 West Front Street
Bloomington, IL  61701
(309) 827-3670
mark@jlawgroup.com